Robert A. KUGLE; Robert Wilson, III; Andrew Toscano; Bridgett Fabila and Juan Antonio Fabila, Jr., Individually and as Representatives of the Estate of Myriam Arlene Fabila, deceased, and of the Estate of John Anthony Fabila, deceased; Juan Antonio Fabila, Sr. and Ana Elva Fabila, Individually and as Next Friends of Guadalupe Fabila Hernandez, a minor, and as Representatives of the Estate of Juani Margarita Fabila, deceased, and of the Estate of Sandra Lorena Fabila Hernandez, deceased, Appellants,

v.

DAIMLERCHRYSLER CORP. and North Star Dodge Sales, Inc., Appellees.

No. 04–00–00617–CV.

Court of Appeals of Texas, San Antonio.

Aug. 21, 2002.

Rehearing Overruled Oct. 7, 2002.

John M. Pinckney, III, Strasburger & Price, L.L.P., Jon R. Alworth, Alworth & Ford, L.L.P., Timothy Patton, Timothy Patton, P.C., Robert L. Wilson, III, Al-

worth & Ford, L.L.P., San Antonio, for Appellants.

George G. Brin, Brin & Brin, P.C., San Antonio, Daivd C. Duggins, Roy A. Spezia, Clark, Thomas & Winters, P.C., Austin, Joseph W. Gagnon, Mark R. Ramsey, Ramsey & Murray, P.C., Houston, for Appellees.

Sitting: PHIL HARDBERGER, Chief Justice, ALMA L. LÓPEZ, Justice, CATHERINE STONE, Justice, PAUL W. GREEN, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice and SANDEE BRYAN MARION, Justice.

## OPINION ON APPELLEE'S MOTION FOR REHEARING EN BANC

Opinion by: KAREN ANGELINI, Justice.

We grant DaimlerChrysler Corporation's Motion for Rehearing En Banc, withdraw our opinion and judgment of April 17, 2002, and substitute this opinion and judgment in their place.

Bridgett Fabila ("Bridgett"), Juan Antonio Fabila, Jr. ("Juan"), Juan Antonio Fabila, Sr., and Ana Elva Fabila, individually and in various representative capacities (collectively referred to as the "Fabilas"), sued DaimlerChrysler Corp. ("DaimlerChrysler") and North Star Dodge Sales, Inc. ("North Star Dodge") after a car accident that resulted in several deaths and numerous injuries. Alleging both witness and evidence tampering, DaimlerChrysler and North Star Dodge moved for sanctions against the Fabilas and their attorneys, Robert Kugle, Robert Wilson, III, and Andrew Toscano. After conducting a hearing, the trial court entered a final judgment holding Kugle, Wilson, and Toscano jointly and severally liable for more than $865,000 in monetary sanctions and imposing "death penalty" sanctions by dismissing the Fabilas' personal injury and wrongful death suit. The Fabilas, Kugle, Wilson and Toscano appeal, contending the trial court: (1) abused its discretion in denying their motion to abate or stay the sanctions hearing; (2) assessed unjust or excessive sanctions; and (3) erred in admitting and excluding certain evidence. We affirm the trial court's judgment.

### BACKGROUND

Bridgett purchased a Dodge Neon from North Star Dodge. On June 16, 1996, Juan lost control of the car, causing the car to leave the roadway and roll over several times. Juan, two of his sisters, and Bridgett's infant son were flung from the car. Only Juan survived. Bridgett's infant daughter, Myriam, suffered severe head injuries, and a passing car took Bridgett and Myriam to a local hospital. At that time, Bridgett was unaware that Juan and another of his sisters had survived the accident and had been taken to a different local hospital for treatment. Given the nature of Myriam's injuries, Bridgett and Myriam were transferred by ambulance to a hospital in Eagle Pass, Texas. After assessing the severity of her injuries, the Eagle Pass hospital transferred Myriam by helicopter to University Hospital in San Antonio, where she died a few days later.

Hector Morales and Marco Villanueva, the two Mexican police officers who investigated the accident scene and completed the accident report, identified "immoderate speed" as the sole cause of the accident. Juan was issued a citation for speeding.

On June 24, 1996, an attorney with the law firm of Kugle, Byrne & Alworth sent a letter to Juan's insurance carrier, Allstate Insurance Company, requesting acknowledgment of coverage for injuries and damages sustained in the accident. Allstate retained the services of Brush Country Claims Service to investigate the coverage

issue. On July 15, 1996, Brush Country informed Allstate that the accident occurred beyond the area covered by the policy. Brush Country's file reflects that its adjuster spoke with Officer Villanueva who stated "that the mother of the deceased children had stated to him that [she] had fallen asleep & when she woke up she saw ar [sic] car & pulled the [steering] wheel to the right when they lost control." Because the accident occurred outside the area covered by the policy, Allstate denied coverage.

In late 1997, DaimlerChrysler issued a recall notice referring to a safety related defect of the steering column design in the Dodge Neon. Bridgett took the recall notice to the Kugle law firm. On May 22, 1998, the Fabilas filed their original petition.

In July of 1998, Kugle, Wilson, and Toscano traveled to a salvage yard in Mexico to examine the car. They were accompanied by Stephen Garza, an investigator with the Kugle law firm, and Tom Persing, who was retained to examine the car and investigate anything that could have given rise to the accident and specifically the steering column. Although the Fabilas were present at the salvage yard to identify Bridgett's car, Persing testified that he never discussed the case with the Fabilas, and Kugle also testified that he never spoke with the Fabilas about the results of the investigation. Persing testified that he told Kugle that he was unable to find any condition of steering that would have caused any loss of control. Persing further testified that he believed Wilson also was made aware of his findings. Kugle testified that Persing only told him that the steering column looked unremarkable and that "it was bad for the home team." During his examination of the car, Persing took several photographs. One of these photographs showed that the steering de-

coupler was not decoupled or separated. Persing testified that although he could not positively state that the Kugle law firm was sent a set of the photos in July of 1998, he had at least a recollection that he sent the photographs to the firm in the July 1998 time frame.

In September of 1998, the Kugle law firm retained a new expert to examine the car. The new expert reported that the steering decoupler was decoupled or separated and concluded that the mechanical failure of the steering system had caused the accident. The Fabilas' petition was amended to allege the decoupler's failure as a cause of the accident. DaimlerChrysler's expert also reported that the steering decoupler was decoupled, but he believed that the decoupling was an effect of the accident, not its cause.

In preparation for trial, DaimlerChrysler sent an engineer and an investigator to Mexico to reconstruct the accident around May of 1999. At that time, the investigator discovered that Officer Morales allegedly questioned Bridgett at the hospital in Mexico before Myriam was transported to Eagle Pass. Officer Morales stated that Bridgett was not hysterical or in shock but appeared calm. Officer Morales stated that Bridgett told him that "her husband was falling asleep, and that when she saw that the vehicle was encroaching the opposite lane she jolted the wheel" or "pulled the wheel to the right, and that they went off the road and that they started to roll over." Officer Villanueva testified that Officer Morales told him that Bridgett had made the statement; however, Officer Villanueva testified that the statement was made in the police office. The police report did not contain any reference to Bridgett's statement even though the report had pre-printed sections that the officers could have checked to indicate that a cause of the accident was the driver sleeping.

DaimlerChrysler subsequently took a sworn statement from the officers and later deposed the officers. During their depositions, the officers disclosed that a few days following the accident, two male members of the Fabilas' family approached Officer Villanueva and requested that he change the location of the accident. In addition, the officers testified that they were approached by Enrique Saldivar, an investigator retained by the Kugle law firm, who offered them a bribe to forget Bridgett's prior statement. Officer Morales testified that Saldivar stated that a lot of money had been invested in the case and "they wanted to end up even, and that's all."

DaimlerChrysler also took the deposition of Javier Ramirez, the ambulance driver who transported Bridgett and Myriam from Mexico to Eagle Pass. Ramirez testified that Bridgett told him "that she noticed that the vehicle was moving from one side to the other. And at that time, she said that she saw a truck was oncoming. She turned to look at her husband, who was driving. She saw him, that he was asleep or dozing off. And that's why she made the decision to pull the wheel toward the right. The vehicle left the road. At that time, the husband woke up and tried to bring the car up on the road again, and that's when she felt they rolled over." Ramirez testified that Bridgett made this statement to him at the hospital in Eagle Pass. Ramirez testified that Bridgett was calm despite the fact that Myriam had three cardiac arrests on route to the hospital in Eagle Pass, requiring her to be resuscitated, and despite overhearing the doctor say that Myriam was in a grave condition. Ramirez also testified that Saldivar had approached him about forgetting Bridgett's statement, threatening his life. Ramirez testified that Saldivar told him that Saldivar was receiving a salary for his work "but if we win, they give me compen-

sation that . . . is superior to my salary by far."

In January of 2000, a report was anonymously sent to DaimlerChrysler's attorney. The report was from Stephen Garza, the investigator with Kugle's law firm who accompanied Persing, Kugle, Wilson, and Toscano to Mexico in July of 1998 to examine the car. The report stated that after examining the car, the steering column and decoupler were unremarkable. The report concluded that Garza could find no equipment failure and/or malfunction other than what appeared to be the front passenger "brake locked" that could have been caused by the driver's reaction and/or the vehicle having been exposed to weather conditions for two years.

Based on the depositions of Officer Morales, Officer Villanueva, and Ramirez, DaimlerChrysler and North Star Dodge filed a motion for sanctions on March 2, 2000, based on witness tampering and perjury. DaimlerChrysler's attorney stated that he did not review the Garza report and discover its import until March 6, 2000. At that time, DaimlerChrysler sought to secure the photos taken by Persing and Garza and to depose them. DaimlerChrysler also requested its expert to reexamine the car in view of Persing's photos and contacted the FBI.

The Fabilas filed a motion to quash the depositions of Persing and Garza based on investigatory privilege. After the motion was denied, the Fabilas filed a notice of nonsuit. When the trial court refused to enter a dismissal of the claims, the Fabilas filed a withdrawal of their notice of nonsuit.

At his deposition, Persing stated that Wilson contacted him on March 21, 2000, requesting him to send copies of his photos by overnight mail. Persing believed Toscano was present in the room with Wilson.

Persing testified that he was subsequently contacted by DaimlerChrysler's attorneys and became concerned about what was occurring. On March 27, 2000, in response to Persing's expressed concerns, Wilson commented that "the Kugle firm was running a bluff but they had their hand called."

Based on the photos and Persing's deposition, DaimlerChrysler and North Star Dodge filed a supplemental motion for sanctions on April 26, 2000, requesting sanctions for evidence tampering. A hearing on the sanctions was set for May 8, 2000, but was subsequently reset by the trial court to May 11, 2000. The Fabilas, Kugle, Wilson, and Toscano filed a motion to abate or stay the sanctions hearing. Before the commencement of the sanctions hearing, the motion was denied. After an evidentiary hearing, the trial court dismissed the underlying lawsuit with prejudice and held Kugle, Wilson, and Toscano jointly and severally liable for more than $865,000 in monetary sanctions.

### DUE PROCESS

■■■ We review a sanctions order for an abuse of discretion. *Herring v. Welborn*, 27 S.W.3d 132, 143 (Tex.App.-San Antonio 2000, pet. denied). A party subject to sanctions has a constitutional right to due process, including a fair and meaningful opportunity to be heard and to present evidence. *University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 930 (Tex. 1995). A trial court abuses its discretion if it violates due process by imposing sanctions without notice or a meaningful hearing. *In re Acceptance Ins. Co.*, 33 S.W.3d 443, 448 (Tex.App.-Fort Worth 2000, orig. proceeding).

■■■ The appellants contend that they were deprived of due process by the trial court's denial of their motion for an abatement or stay. The appellants assert that the abatement or stay was necessary to enable their expert to examine the car in view of the allegations of evidence tampering and to protect certain witnesses' Fifth Amendment privileges.[1]

Although the appellants contend that they needed to re-examine the car to effectively cross-examine DaimlerChrysler's expert regarding the evidence tampering findings, the trial court's refusal to grant an abatement to allow such an inspection did not harm the appellants. Although the trial court found that the evidence had been tampered with, the trial court did not rest its sanctions on a finding that the appellants were responsible for the tampering. Instead, the trial court supported the sanctions on the basis that the appellants had knowledge that an earlier inspection showed an intact decoupler, making it fraudulent not to disclose the earlier inspection and to allege that the accident was caused by a failed decoupler. Although an additional examination of the car might have enabled the appellants to respond to the evidence tampering allegations, any evidence acquired during such an examination would not excuse the failure to disclose the findings from the prior inspection revealing an intact decoupler.

■■■ With regard to the Fifth Amendment contention, a trial court is required to give consideration to the effect of discovery in a civil case on pending criminal proceedings. *In re R.R.*, 26 S.W.3d 569, 574 (Tex.App.-Dallas 2000, orig. proceeding); *Texas Attorney General's Office v. Adams*, 793 S.W.2d 771, 777 (Tex.App.-Fort Worth 1990, orig. proceeding). How-

---

1. Additional time was requested to examine the car because the FBI had seized the car before the appellants' expert could re-exam-ine the car in light of the evidence tampering allegations.

ever, the pendency of a criminal matter does not impair a court's proceeding with a contemporaneous civil matter involving the same issues or parties. *In re R.R.*, 26 S.W.3d at 574. There is no constitutional prohibition against both cases going forward simultaneously, and a party's attempt to develop evidence in a civil case does not lead to any presumption that a party is trying to develop evidence for a contemporaneous criminal case. *See Meyer v. Tunks*, 360 S.W.2d 518, 522–23 (Tex. 1962); *In re R.R.*, 26 S.W.3d at 574. An individual witness's right to claim protection from discovery to any particular question in the civil case does not stop all proceedings in the civil case involving the witness. *Meyer*, 360 S.W.2d at 522–23; *In re R.R.*, 26 S.W.3d at 574.

The appellants rely on *Texas Dept. of Public Safety Officers Ass'n v. Denton*, 897 S.W.2d 757 (Tex.1995), to assert that due process concerns were implicated because Wilson and Garza asserted their Fifth Amendment privilege and refused to testify at the sanctions hearing. However, in *Denton*, the Texas Supreme Court recognized the implication of due process concerns only "when a court dismisses a party's cause of action on the basis of that party's use of the privilege against self-incrimination." 897 S.W.2d at 763. Garza was not a party to the lawsuit and was not sanctioned. Although Wilson was sanctioned, the trial court's decision to go forward with the sanctions hearing did not violate any constitutional prohibition. *See In re R.R.*, 26 S.W.3d at 574. In view of the other evidence presented at the sanctions hearing, we cannot conclude that the trial court abused its discretion in denying a stay or abatement based on the parallel criminal proceeding.

## EVIDENTIARY RULINGS

■■ The appellants complain of several evidentiary rulings by the trial court

admitting and excluding certain evidence. Whether to admit or exclude evidence is a matter committed to the trial court's sound discretion. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). A trial court abuses its discretion when it acts without regard to any guiding rules or principles.

### a. Depositions of Officer Morales, Officer Villanueva, and Ramirez

■ The appellants contend that the trial court erred in admitting the deposition testimony of Officer Morales, Officer Villanueva, and Ramirez because the depositions were taken in Mexico but the witnesses were only sworn by a Texas notary public. However, a foreign deposition may be taken by any notary public. *See* Tex.R. Civ. P. 201.1(b); Tex. Civ. Prac. & Rem.Code Ann. § 20.001(c)(3) (Vernon 1997) (deposition of any witness residing outside the U.S. may be taken by any notary public). Accordingly, the trial court did not abuse its discretion in admitting the depositions.

### b. Privileged Testimony

The appellants assert that the trial court erred in denying the motions to quash the depositions of Persing and Garza because their testimony was privileged. The appellants further assert that the trial court erred in denying Wilson's assertion of the attorney-client privilege at the sanctions hearing.

■ "A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client." Tex.R. Evid. 503(b). No attorney-client privilege exists if the "crime-fraud" exception in Rule 503 applies. Tex.R. Evid. 503(d)(1). The crime-fraud exception applies only if a prima

facie showing is made of contemplated fraud. *Granada Corp. v. Hon. First Court of Appeals,* 844 S.W.2d 223, 227 (Tex.1992). There must also be a relationship between the information sought and the prima facie proof offered. *Id.*

■ The Garza report that was anonymously provided to DaimlerChrysler's attorney was evidence that a prior inspection of the car revealed no steering problems. The report noted that Persing was present during the investigation and took photos. The report and the allegations in the petition relating to the allegedly defective steering decoupler were prima facie proof that DaimlerChrysler was being defrauded with regard to the cause of the accident. DaimlerChrysler sought to depose Garza and Persing in relation to the prior inspection and findings. When Persing was deposed, he stated that Wilson was present at the inspection, and he believed that Wilson was made aware of the findings. Wilson subsequently told Persing that the Kugle law firm was running a bluff. This is sufficient prima facie proof of a crime-fraud exception to defeat the assertion of the attorney-client privilege.

*c. Affidavits of Officer Morales and Officer Villanueva*

■ The appellants sought to introduce affidavits from Officer Morales and Officer Villanueva recanting their deposition testimony regarding the bribes. However, the appellants did not offer the affidavits into evidence or obtain a ruling on their admissibility. Accordingly, error, if any, was waived. Tex.R.App. P. 33.1(a).

*d. Statements from Rosenbluth, Saldivar & Gutierrez*

■ The appellants sought to introduce affidavits from the following individuals: (1) Gerald Rosenbluth regarding the inspection and tests necessary to address the evidence tampering allegations; (2) Enrique Saldivar, the investigator accused of attempting to bribe the officers and Ramirez; and (3) Octavio Gutierrez, a federal police officer in Mexico. The trial court sustained hearsay objections to each of the affidavits. In response, the appellants argued that rule 215.6 of the Texas Rules of Civil Procedure permits testimony by affidavit. On appeal, the appellants also contend that the statements were admissible as statements against interest and for impeachment. Because the appellants did not proffer to the trial court any exception to the hearsay rule as grounds for the admission of the affidavits, the appellants have failed to preserve for our review any contention that the affidavits were admissible as statements against interest. *See State v. Foltin,* 930 S.W.2d 270, 273 (Tex. App.-Houston [14th Dist.] 1996, writ denied); *Butler v. Comm'n for Lawyer Discipline,* 928 S.W.2d 659, 665 (Tex.App.-Corpus Christi 1996, no writ); *Butler v. De La Cruz,* 812 S.W.2d 422, 425 (Tex.App.-San Antonio 1991, writ denied). With regard to rule 215.6, appellants liken a sanctions hearing to a summary judgment hearing and argue that since the sanctions rule contemplates the use of affidavits as exhibits to a response to a sanctions motion, the affidavits are admissible at the sanctions hearing in the same manner as such exhibits are admissible at a summary judgment hearing. However, unlike a sanctions hearing, a summary judgment hearing is "an exception to the usual and traditional form of procedure wherein witnesses are heard in open court and documentary evidence is offered and received in evidence." *IKB Indus. (Nigeria) Ltd. v. Pro–Line Corp.,* 938 S.W.2d 440, 441 (Tex.1997) (quoting *Richards v. Allen,* 402 S.W.2d 158, 160 (Tex.1966)); *see also Jack B. Anglin Co., Inc. v. Tipps,* 842 S.W.2d 266, 269 (Tex.1992) (noting summary judg-

ment exception to requirement of hearing at which witnesses present sworn testimony in person or by deposition rather than by affidavit). In order to assess sanctions in this case, the trial court was required to conduct an *evidentiary* hearing to which the rules of evidence necessarily apply. *See Randolph v. Walker*, 29 S.W.3d 271, 277 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *Karagounis v. Property of Co. of America*, 970 S.W.2d 761, 765 (Tex. App.-Amarillo 1998, pet. denied); *Electronic Data Sys. Corp. v. Tyson*, 862 S.W.2d 728, 739 (Tex.App.-Dallas 1993, no writ). Therefore, although rule 215.6 allows affidavits to be attached to a response to a sanctions motion, in order for the trial court to consider such affidavits, they must be admitted in compliance with the rules of evidence at the evidentiary hearing.

### PROPRIETY OF SANCTIONS

■ We review a sanctions order under an abuse of discretion standard. *Herring v. Welborn*, 27 S.W.3d at 143. Our scope of review is the entire record that was before the trial court. *Id.* We review the conflicting evidence in the light most favorable to the trial court's ruling, and draw all reasonable inferences in favor of the court's judgment. *Id.* However, an order imposing discovery sanctions may be reversed for an abuse of discretion even if findings and evidence support it. *IKB Indus. (Nigeria) Ltd. v. Pro–Line Corp.*, 938 S.W.2d at 442.

■ Sanctions must be just under the circumstances. *In re Ford Motor Co.*, 988 S.W.2d 714, 718 (Tex.1998); *Trans-American Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex.1991). When determining whether the sanctions a trial court imposes are just, we consider two factors. *In re Ford Motor Co.*, 988 S.W.2d at 718. First, we consider whether there is a direct relationship between the offen-

sive conduct and the sanctions. *Trans-American*, 811 S.W.2d at 917. Under this principle, the trial court must attempt to determine if the offensive conduct is attributable to the attorney, the party, or both. *Id.* Second, we consider whether the sanctions are excessive. *Id.* This second principle generally requires a trial court to first test the effectiveness of lesser sanctions before entering death penalty sanctions. *Id.* at 918. In addition, constitutional due process precludes the imposition of sanctions that determine the merits of a case unless the discovery abuse justifies a legal presumption that the disobedient party's claims or defenses lack merit. *Id.*

### a. Joint and Several Liability of Attorneys

■ Kugle, Wilson, and Toscano each contend that the trial court erred in awarding joint and several sanctions against them without identifying how and in what proportion each was at fault. However, Persing testified that all three attorneys were present during the July 1998 inspection. Persing further testified that Kugle was informed of Persing's findings and that he believed Wilson also was made aware of the findings. Kugle testified that he, Wilson, and Toscano traveled to Monterrey for a few days and, during that time, the three attorneys discussed the case. Kugle previously testified that he recalled Persing say the results were "bad for the home team" and the steering column was unremarkable. Kugle testified that the three attorneys "talked about everything that [he] visited with [the attorney examining him during the sanctions hearing] about." Kugle further stated that the three attorneys probably did discuss that Persing "had given [the] vehicle a clean bill of health."

The monetary sanctions that the trial court assessed were the amount spent on

attorneys' fees defending against the theory that the decoupler failed. Based on the evidence, the trial court did not abuse its discretion in concluding that all three attorneys were aware of the July 1998 investigative findings contrary to the failed decoupler theory, and that all three attorneys failed to disclose the July 1998 findings. Therefore, the trial court did not abuse its discretion in ordering that the sanctions be paid jointly and severally by the three attorneys. *See In re Zenergy, Inc.,* 968 S.W.2d 1, 11 (Tex.App.-Corpus Christi 1997, orig. proceeding) (joint and several liability appropriate where abuse results from interwoven conduct). Although Toscano contends that he resigned in March of 2000 after receiving the photos from Persing, the trial court's findings rest on actions taken in the case from May 22, 1998 through March of 2000. Accordingly, the trial court did not abuse its discretion in holding Toscano jointly and severally liable despite his belated resignation.

### b. Dismissal of Lawsuit

■ The trial court made numerous findings upon which it based its judgment. Among those findings are that Bridgett's pre-lawsuit account of the accident, which she related to a police officer and an ambulance driver, consisted of a statement that she grabbed the steering wheel from her husband because he had fallen asleep. When her husband awoke, he tried to regain control, and the car rolled over. The trial court further found that the police officer repeated Bridgett's version to a fellow police officer, and the officers then recounted essentially the same version to an insurance company investigator. The trial court gave credence to this testimony and found that when Bridgett later denied, under oath, that she had made these presuit admissions, she was testifying falsely.

The trial court also found that as a result of the July 6, 1998 inspection, the plaintiffs became aware that there was no steering defect and that their pleadings alleging a steering decoupler failure were false. Additionally, the trial court found that in September 1998, the plaintiffs knew the condition of the car, now with a separated decoupler, was different from its condition in July 1998. Thus, the court found that the plaintiffs' contentions in their lawsuit were fraudulent. The court specifically stated it was inferring knowledge and intent from certain factors, including the plaintiffs taking a non-suit with prejudice in a $2 billion lawsuit after the court ordered discovery concerning the July 1998 inspection and the plaintiffs failing to call witnesses available to them who had personal knowledge about the facts and issues. The court further found the plaintiffs' conduct in filing and pursuing the lawsuit was knowingly and intentionally fraudulent. The trial court based its findings on Bridgett's pre-suit admissions to the police officer and ambulance driver, the July 6, 1998 investigation, and the photographs which show there was no steering failure and which confirm Bridgett's pre-suit admissions. These findings are supported by the record; thus, the trial court did not abuse its discretion in making these findings.

Following the dictates of the supreme court in *TransAmerican,* we first consider whether, in this case, there is a direct relationship between the offensive conduct and the sanction imposed. Did the conduct justify the trial court's dismissal with prejudice? We believe that it did. This case involved witness tampering, evidence tampering, and the giving of false testimony. This case involved the plaintiffs taking a non-suit with prejudice, the timing of which showed an obvious attempt to avoid disclosure of wrongdoing. This case is an egregious example of the worst kind of abuse of the judicial system. The trial

court found that lesser sanctions, under the facts of this case, would be inappropriate. Dismissal with prejudice was an entirely appropriate sanction.

We next consider whether the conduct was attributable to counsel, the parties or both. The plaintiffs were all present at the salvage yard in July 1998 for the vehicle inspection when the steering mechanism was found to be intact. Regardless of testimony to the contrary, it was not an abuse of discretion for the court to conclude, by the plaintiffs' presence at the July 6, 1998 investigation and conversations with their attorneys thereafter, that they were aware of the results of the investigation. It was not an abuse of discretion for the court to infer that the plaintiffs, who all appeared at the inspection specifically for the purpose of discovering if there was something wrong with the vehicle's steering mechanism, would not have left without first finding out the results. Further, it was not unreasonable for the trial court to find the plaintiffs participated in the wrongdoing given that they non-suited their case with prejudice in the face of having to comply with discovery that would reveal the wrongdoing. Nor was it unreasonable for the trial court to conclude the plaintiffs were responsible for wrongdoing given that they continued with their lawsuit knowing that there was no steering defect. Further, the trial court could reasonably have concluded that the plaintiffs participated in the wrongdoing since, with the exception of Bridgett, no other plaintiffs testified in defense of

the accusations of fraud against them. In short, it was not an abuse of discretion for the trial court to conclude that the plaintiffs themselves were aware of and participated in the wrongdoing given their presence at the July 1998 inspection, Bridgett's false testimony, and the taking of the non-suit with prejudice in an obvious attempt to avoid exposure of the wrongdoing.

Furthermore, the trial court was entitled to make a credibility determination with regard to Bridgett's testimony. *See Daniel v. Kelley Oil Corp.*, 981 S.W.2d 230, 232–33 (Tex.App.-Houston [1st Dist.] 1998, pet. denied).[2] And, the record supports the trial court's findings. Bridgett related her pre-suit version of the facts shortly after the accident to a police officer and an ambulance driver. The officer related the information to another officer, who eventually passed it on to an insurance adjuster, who made a written notation in his file. These events all occurred within a few days of the accident. The trial court did not abuse its discretion in finding Bridgett's post-suit sworn testimony, which differed substantially from her original version of the facts, to be untruthful.

Finally, we consider whether the sanction imposed was excessive. In making this determination, we keep in mind that the sanction should not be used to adjudicate the merits of the case unless the party's actions justify a presumption that the case lacks merit. *TransAmerican*, 811 S.W.2d at 917. We find that the parties' actions in this case justify such a presumption. Based on the July 1998 inspection,

**2.** The plaintiffs herein rely on *Lanfear v. Blackmon*, 827 S.W.2d 87 (Tex.App.-Corpus Christi 1992, orig. proceeding), to support their position that the trial court cannot make credibility findings in a sanctions hearing. We agree with the First Court of Appeals' analysis in *Daniel v. Kelley Oil Corp.*, 981 S.W.2d 230 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). In *Daniel*, the court found that *Lanfear* did not control for two reasons: (1) the court of appeals in *Lanfear* accepted the trial court's finding of untruthful testimony, stating the issue was really whether the factual conclusions found by the trial authorize the sanctions imposed by him under the circumstances; and (2) the perjurious statement did not go to the heart of the controversy, as it did in *Daniel* and as it does in this case. *Id.* at 232.

the plaintiffs knew there was no steering decoupler defect as alleged in their pleadings. And, Bridgett's pre-suit account of the accident is not consistent with a steering defect on the vehicle. Apparently realizing their steering defect claim lacked merit, the plaintiffs urged the trial court and now urge this court to allow them to change their cause of action to a "crashworthiness" claim. Even construing the pleadings liberally, the plaintiffs have not plead a cause of action for "crashworthiness" and should not be allowed, at this late date, to change the entire nature of their lawsuit. The plaintiffs' live pleadings relate only to the steering defect claim and contain no allegations that could be construed as a "crashworthiness" claim. Moreover, at the sanctions hearing, they provided no evidence in support of a "crashworthiness" cause of action. The plaintiffs' designated liability experts only relate to the steering defect claim. Most significantly, the plaintiffs' new counsel represented to the trial court at a hearing on a motion to continue the sanctions hearing that they were ready for a jury trial on the merits and would not designate new experts. Accordingly, the trial court ordered that there would be no further discovery and that the case would proceed to trial. At that time, the plaintiffs' pleadings only alleged a steering defect claim and their only designated experts were for this steering defect claim. The parties' actions in this case justify a presumption that their claims lack merit.

We hold that the trial court did not abuse its discretion in dismissing the plaintiffs' case with prejudice.

### CONCLUSION

For all the above-stated reasons, we affirm the trial court's judgment in its entirety.

PHIL HARDBERGER, C.J., not participating.

Dissenting Opinion by: CATHERINE STONE, Justice, joined by ALMA L. LÓPEZ.

This case presents a sordid set of facts revealing attorney misconduct. As I wrote on original submission of this case, the trial court properly imposed sanctions against the attorneys; accordingly, on en banc submission I concur with the majority's rulings in all regards but the dismissal of the Fabilas' suit. However, I respectfully dissent from that portion of the majority opinion which affirms the dismissal of the underlying suit.

The trial court's dismissal of the underlying lawsuit appears to be based on its findings that the Fabilas had knowledge of the results of the July 1998 investigation and Bridgett's allegedly perjured testimony. However, there is no evidence in the record from which the trial court could reasonably infer that the Fabilas had knowledge of the investigators' findings in July of 1998. Persing testified that he was socially introduced to the Fabilas upon arriving at the salvage yard, but he did not discuss his findings with them or even keep track of where they went after the introduction. Kugle testified that he did not disclose the investigators' findings to the Fabilas, and the Fabilas were only present at the salvage yard to identify the car for inspection. Bridgett testified that the Fabilas arrived at the salvage yard separately from the attorneys and investigators and were not informed of the investigators' findings. Therefore, I do not believe the evidence supports the imposition of sanctions against the Fabilas based on the attorneys' fraudulent conduct regarding the July 1998 investigation.

The majority contends that the Fabilas appeared at the inspection "specifically for the purpose of discovering if there was

something wrong with the vehicle's steering mechanism." (88 S.W.3d at 366). Our record contains no evidence to support this contention. The only evidence is that the Fabilas were present at the salvage yard for the purpose of identifying the vehicle involved in the accident. Nor is there any evidence that the Fabilas were physically present by the vehicle as it was inspected. Rather, the only evidence in the record is Persing's testimony that he was socially introduced to the Fabilas "on the exterior of the salvage yard" and Bridgett's testimony that she was "standing by the entrance of the junkyard." The majority concludes that the trial court could reasonably infer that the plaintiffs were informed of the results of the investigation by their presence at the salvage yard and the subsequent occurrence of a conversation with their attorneys. The Fabilas' presence and the subsequent conversation, however, are merely circumstantial evidence. "[W]hen circumstantial evidence is so slight that any plausible inference is purely a guess, it is in legal effect no evidence," because "suspicion and conjecture are not evidence." *Lozano v. Lozano*, 52 S.W.3d 141, 148, 152 (Tex.2001) (Phillips, C.J., concurring and dissenting). The trial court in this case was not permitted to infer that the attorneys informed the Fabilas of the results of Persing's investigation because the trial court is not permitted to guess about the subject of the conversation, particularly in view of Kugle's testimony that the conversation revolved around the injuries to one of the plaintiffs, not the test results.

The only other basis for the "death penalty" sanctions assessed against the Fabilas was the trial court's finding that the Fabilas pursued a lawsuit contending that the accident was caused by steering failure despite Bridgett's prior statements regarding driver negligence. However, the inconsistency in Bridgett's testimony does not support the "death penalty" sanctions assessed by the trial court.

Although punishment and deterrence are legitimate purposes for sanctions, they do not justify trial by sanctions. *Trans-American Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 918 (Tex.1991). When a trial court strikes a party's pleadings and dismisses its action for abuse of the discovery process, the court adjudicates the party's claims without regard to their merits but based instead upon the party's conduct of discovery. *Id.* Discovery sanctions should not be used to adjudicate the merits of a claim or defense unless a party's obstruction of the discovery process justifies the presumption that the claim or defense lacks merit. *Id.*

A trial court may not effectively adjudicate the merits of a case based on testimony of a party during a sanctions hearing because he was later impeached on testimony given at that hearing. *Lanfear v. Blackmon*, 827 S.W.2d 87, 91 (Tex.App.-Corpus Christi 1992, orig. proceeding [leave denied]). The witness' credibility should be tested when the case is tried. *Id.* Otherwise, a trial court could at any time interrupt a trial proceeding if it believed a witness was being untruthful, and simply enter a default against the party procuring that witness for that reason. *Id.* A "death penalty" sanction is not proper punishment for what was perceived by the court to be perjured testimony. *Id.* Although the trial court's conclusions of law recite that "lesser sanctions would be inappropriate," the record does not reflect that the trial court considered lesser sanctions or why lesser sanctions would be ineffective. *Id.; see also Fletcher v. Blair*, 874 S.W.2d 83, 86 (Tex.App.-Austin 1994, writ denied) (finding abuse of discretion where lesser sanctions not considered despite plaintiff's false testimony).

The consideration of lesser sanctions is particularly important in this case. Bridgett was only one of the plaintiffs who filed the lawsuit. Although the court perceived Bridgett's inconsistency regarding the events preceding the accident to be perjury, the testimony of the officers and the ambulance driver Ramirez regarding the statement allegedly made by Bridgett was not without question. *See Fort Worth Hotel Ltd. P'ship v. Enserch Corp.*, 977 S.W.2d 746, 761 (Tex.App.-Fort Worth 1998, no pet.) (that a jury believes one party's account does not mean other party's witnesses perjured themselves). Both Officer Morales and Ramirez stated that Bridgett was calm despite her knowledge that her infant son was dead, her infant daughter was in grave condition, and her belief that her husband was dead. Furthermore, Ramirez testified that Bridgett was calm despite her knowledge that her infant daughter required cardiac resuscitation on three occasions during the trip to the Eagle Pass hospital and the doctor's statement that her daughter was in grave condition. The police report did not contain the statement Bridgett allegedly made to Officer Morales, nor did it indicate on the pre-printed form that Juan's sleeping was a contributing cause to the accident. Finally, Officer Villanueva testified that the statement was taken at the police station, not the hospital, at a time when Bridgett could not have been at the police station. In view of these circumstances raising questions with regard to the prior statement allegedly made by Bridgett, a "death penalty" sanction against all of the plaintiffs is not proper punishment for what was perceived by the court to be perjured testimony. *Lanfear*, 827 S.W.2d at 91.

The majority relies heavily on *Daniel v. Kelley Oil Corp.* in seeking to uphold the "death penalty" sanction. 981 S.W.2d 230 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). However, in *Daniel*, expert testimony was presented that the plaintiff fabricated an audio cassette recording as evidence of sexual harassment. 981 S.W.2d at 231. In this case, there is no fabricated evidence. There is only a question as to whether Bridgett made the prior statement. Furthermore, the Fabilas' newly-retained attorney argued at the sanctions hearing that one of the claims remaining in the case was a claim relating to "crashworthiness."[1] In crashworthiness cases, the alleged defect need not be the cause of the collision that precipitated the injury. *General Motors Corp. v. Castaneda*, 980 S.W.2d 777, 780 (Tex.App.-San Antonio 1998, pet. denied). Instead, the alleged defect need only have enhanced the injury. *Id.* Accordingly, the jury apportions responsibility in crashworthiness

---

1. The Fabilas' attorney stated that the current pleadings can be read as permitting this theory of liability, and since the defendants have been reimbursed for the attorneys' fees expended in the prior attorneys' pursuit of the failed decoupler theory, the defendants are not prejudiced by the pursuit of the crashworthiness theory. The majority contends that the pleadings contain no allegations that can be construed as a "crashworthiness" claim. On the contrary, the pleadings contain the following allegation, "The malfunction and defective condition of the subject motor vehicle, including its steering column system, was a producing cause of the Plaintiffs' injuries and damages, and the untimely deaths of decedents for which the Defendants are responsible to the Plaintiffs under the doctrine of strict liability." Therefore, the allegation of malfunction and defective condition is a broad allegation, and although the allegation expressly includes the defective steering column, it is not limited to that defect. Finally, the majority's contention that the Fabilas could not prove a crashworthiness claim in view of the existing discovery and designated experts is for the trial court to decide at a summary judgment hearing, not for this court to decide on appeal.

cases between all whose action or products combine to cause the entirety of the plaintiff's injuries. *Id.* at 780–81. Therefore, even if a jury were to believe that Juan fell asleep and the car rolled after Bridgett turned the steering wheel, the jury could still find that some defect in the car enhanced the injuries sustained by the victims of the accident. Because "death penalty" sanctions were inappropriate for what the trial court perceived to be perjury by one of the plaintiffs and because the trial court did not consider lesser sanctions, the trial court abused its discretion in dismissing the lawsuit. Accordingly, I dissent from the majority's contrary ruling.