**RESPONSE TIME, INC. and Steven Edwards a/k/a Steven E. Lansky, Appellants,**

**v.**

**STERLING COMMERCE (NORTH AMERICA), INC., Sydney Hicks, and Robert Martin Koser, III, Appellees.**

No. 05–01–01842–CV.

Court of Appeals of Texas, Dallas.

Dec. 20, 2002.

Christine D. Roseveare, Strasburger & Price, L.L.P., Dallas, for appellants.

Gerald Conley, Andrews & Kurth, Dallas, for appellees.

Before Justices WHITTINGTON, O'NEILL, and LAGARDE.[1]

## OPINION

Opinion By Justice WHITTINGTON.

Response Time, Inc. and Steven Edwards a/k/a Steven E. Lansky (collectively Response Time) appeal the trial court's judgment striking its pleadings, imposing $50,000 in attorney's fees as additional sanctions, and awarding damages to Sterling Commerce (North America), Inc., Sydney Hicks, and Robert Martin Koser, III (collectively Sterling Commerce) on its misappropriation of trade secrets claim. In three issues, Response Time contends the trial judge erred in striking both its counterclaims and its defensive pleadings and in failing to consider lesser sanctions before imposing "death penalty" sanctions.

Response Time does not challenge the $50,000 in attorney's fees as a sanction or the damage award. We affirm the trial court's judgment.

## BACKGROUND

Sterling Commerce developed a software program known as Vector:Sort used by many financial institutions. Wayne T. Humphrey, an employee of Sterling Commerce, worked on Vector:Sort. Humphrey and Sterling Commerce had an employment agreement that provided he would preserve all of Sterling Commerce's confidential information and not use such confidential information for anything other than Sterling Commerce's business.

Response Time employs and places programmers in the financial industry. Lansky is the president of the company. Response Time recruited Humphrey from Sterling Commerce and placed him at National City Bank to work as the project manager overseeing the installation of the Vector:Sort software program.

Sterling Commerce sued Response Time, Lansky, and Humphrey alleging causes of action for tortious interference with contractual relations, breach of contract, theft of trade secrets, misappropriation, and unfair competition.[2] Sterling Commerce also sought injunctive relief. On September 1, 1998, the parties entered into an agreed temporary injunction preventing any changes in Humphrey's job status at National City Bank pending trial on the merits. On September 17, 1998, in violation of this order, Humphrey was relieved of his duties as manager so he could concentrate on the technical aspects of Vector:Sort.

---

1. The Honorable Sue Lagarde, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

2. Humphrey died on June 26, 1999, and all claims against him were nonsuited.

Response Time, in turn, filed counterclaims against Sterling Commerce and third-party defendants Sydney Hicks, the president of Sterling Commerce, and Robert Martin Koser, III, a former Response Time employee hired by Sterling Commerce. Response Time alleged numerous causes of action, including defamation.

In support of its defamation claim, Response Time produced notes detailing conversations in which prospective clients declined to work with Response Time because of statements made by Sterling Commerce employees. Although Lansky testified in support of these notes, Response Time failed to produce these notes in response to an earlier request for production of all documents of communications Lansky had with Hicks. As suspicion mounted regarding the authenticity of these notes and the trial judge voiced his inclination to have the notes tested, Lansky confessed they were fabricated. Response Time subsequently withdrew the counterclaims that it believed were related to the fabricated evidence. Remaining were Response Time's "Koser counterclaims" (interference with existing and prospective business relations, conspiracy, and quantum meruit) and its defenses to the trade secrets claims.

Sterling Commerce moved for sanctions on the basis of the fabricated notes, concealment of Humphrey's job change, and other discovery abuses. The trial judge granted the motion and entered an order striking all of Response Time's pleadings and imposing $50,000 in attorney's fees as an additional sanction.[3] Sterling Commerce then moved for summary judgment on damages for its misappropriation of trade secrets claim. The trial judge granted the motion, awarded Sterling Commerce $147,089.77 in damages, and ordered a permanent injunction. This appeal timely followed.

### STANDARD OF REVIEW

We review a trial judge's imposition of sanctions for an abuse of discretion. *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex.1991). We review the entire record, including the evidence, arguments of counsel, written discovery on file, and the circumstances surrounding the party's discovery abuse. *Daniel v. Kelley Oil Corp.*, 981 S.W.2d 230, 234 (Tex.App.-Houston [1st Dist.] 1998, pet. denied).

### "DEATH PENALTY" SANCTIONS

■ Discovery sanctions serve three purposes: (i) to secure the parties' compliance with the discovery rules; (ii) to deter other litigants from violating the discovery rules; and (iii) to punish parties who violate the discovery rules. *McRae v. Guinn Flying Serv.*, 778 S.W.2d 189, 191 (Tex.

---

**3.** With respect to Response Time's counsel, the trial judge stated in the sanctions order:

Sam Rowland represented all Defendants until January 7, 2000, when an Agreed Motion to Substitute was filed and Strasburger & Price appeared and assumed the representation of Lansky and Response Time (Rowland and Strasburger & Price will be referred to collectively and/or individually as "Texas Counsel"). Defendants' Texas Counsel were not aware of Defendants' perjury, fabrication of evidence, violation of the Injunction Order, or any other wrongful conduct by Defendants prior to March 15,

2000. The Court finds that Defendants' Texas Counsel did not engage in any inappropriate, unethical or wrongful conduct in connection with this action. The Court further finds that Defendants' Texas Counsel fully complied with and discharged all their ethical responsibilities, including but not limited to, Rule 3.03 of the Texas Disciplinary Rules of Professional conduct and properly disclosed to the Court and opposing counsel the fact that Defendants fabricated the handwritten notes and testified falsely about them. They performed admirably under very difficult circumstances.

App.-Houston [1st Dist.] 1989, no writ). Although the choice of sanctions under civil procedure rule 215 is left to the sound discretion of the trial judge, the sanctions imposed must be just. TEX.R. CIV. P. 215.2; *Wal-Mart Stores, Inc. v. Butler*, 41 S.W.3d 816, 817 (Tex.App.-Dallas 2001, no pet.). There are certain limitations on a trial judge's power to impose sanctions for discovery abuse. First, the sanction must bear a direct relationship to the offensive conduct. Second, the sanction must not be excessive. Next, because a trial judge's power to impose "death penalty" sanctions is limited by due process concerns, the judge must consider less severe sanctions before imposing "death penalty" sanctions. In addition, the offensive conduct must justify a presumption that the offending party's claims or defenses lack merit before the trial judge may impose "death penalty" sanctions. *TransAmerican*, 811 S.W.2d at 917–18.

On appeal, Response Time challenges the trial judge's decision to impose "death penalty" sanctions by striking Response Time's pleadings. Specifically, in its first issue, Response Time contends the trial judge abused his discretion in failing to consider lesser sanctions. In its second and third issues, Response Time contends the trial judge erred in striking its defensive pleadings and Koser counterclaims because they lacked merit. We address these three issues together and examine the record to determine whether the trial judge abused his discretion in striking Response Time's pleadings.

■ We first consider whether the sanctions imposed bear a direct relationship to the offensive conduct. Response Time asserted several counterclaims with respect to Sterling Commerce's hiring of Koser: (i) interference with existing and prospective business relationship; (ii) conspiracy; and (iii) quantum meruit. In his first deposition, Lansky testified that Response Time never contracts with potential employees until it has a written commitment from the customer to hire the employee. Although Response Time did not have a written commitment from Sterling Commerce to hire Koser, Response Time initially stated, in its response to an interrogatory, that it did enter into an oral contract with Koser on February 5, 1998 and provided the details of the contract. Over one year later, Response Time amended its interrogatory response stating that it "acknowledges that the substance of the prior answer was incorrect."

The same day Response Time amended its interrogatory response, it also produced a letter dated February 25, 1998 that Lansky allegedly sent to Hicks. The letter allegedly confirms their conversation setting Koser's interview date. The trial judge subsequently found the letter was fabricated. Response Time claims there is insufficient evidence to support that finding. We disagree.

Several questionable circumstances surround this letter. First, it was produced almost two years after Sterling Commerce requested all documents relating to conversations between Lansky and Hicks. Second, unlike almost all other correspondence between Lansky and Hicks, the February 25th letter was not faxed. Third, Lansky and Hicks both provided a timeline outlining the events relating to Koser. Neither timeline mentioned the February 25th letter, and both indicated the interview was set up at some point after February 25th. This evidence is sufficient to support the trial judge's finding that the letter was fabricated.

It is undisputed that Response Time first sent Koser's resume to Sterling Commerce on February 25, 1998. And the record shows Response Time and Sterling Commerce never entered into an agree-

ment regarding Koser. Moreover, Lansky's testimony with respect to Koser is irreconcilable. He initially testified that he did not personally speak with Koser until after Sterling Commerce interviewed him in March of 1998. He later said he recruited Koser on February 9, 1998. In light of this evidence, we conclude Response Time's offensive conduct is directly related to the sanctions imposed with respect to the Koser counterclaims.

Next, Response Time maintains that Lansky's perjured testimony and fabricated evidence had no bearing on its defenses to Sterling Commerce's claim that it misappropriated trade secrets. Again, we disagree. Response Time raised the following defenses to the misappropriation of trade secrets claim: (i) the employment agreement between Sterling Commerce and Humphrey lacked consideration; (ii) Sterling Commerce did not disclose any trade secrets to Humphrey; and (iii) no privity of contract existed between Sterling Commerce, Response Time, and Lansky.

Three weeks into the temporary injunction prohibiting any change in Humphrey's job duties, Humphrey began a new job utilizing his intimate knowledge of the Vector:Sort software. According to Bill Naylor, a National City Bank employee, the change in job positions allowed Humphrey to concentrate on the actual application of the software. National City Bank wanted to take advantage of his knowledge of Vector:Sort. Naylor said the change in Humphrey's responsibilities was communicated to Response Time. Nevertheless, Response Time went to great lengths to keep this information from Sterling Commerce for well over two years. In fact, Sterling Commerce did not become aware of Humphrey's job change until it finally deposed Naylor on March 27, 2000.

Long after Humphrey began working on the software, Response Time continued to assert its defense to Sterling Commerce's trade secrets claim that Humphrey was no more than a project manager. In Response Time's motion for summary judgment filed on June 8, 1999, it continued to assert that Humphrey's job at National City Bank was that of project manager. Attached to its motion for summary judgment was Humphrey's affidavit dated June 1, 1999. In it, Humphrey stated that his position at National City Bank was that of project manager. These assertions to the trial court in 1999 were false.

Not only did Response Time fail to inform Sterling Commerce of the change in Humphrey's job responsibilities, it failed to cooperate when Sterling Commerce tried to take the depositions of employees at National City Bank. Response Time refused to agree to the depositions and claimed the depositions were unnecessary and merely an attempt to "perpetuate their tortious interference with our clients' past and prospective contractual relations with National City Bank." Response Time then filed a motion for sanctions claiming that Sterling Commerce was abusing the judicial process. In its motion, Response Time requested that the trial judge prohibit Sterling Commerce from taking the deposition of or speaking with any National City Bank employee. Again, Response Time went to great lengths to hide Humphrey's job change. The reason is clear. Response Time knew the true nature of Humphrey's job duties would be revealed thus damaging its defense to the trade secrets claim.

After reviewing the evidence, we conclude the sanctions imposed were directly related to Response Time's offensive conduct. Finally, we note there is no dispute that Response Time fabricated evidence and engaged in a pattern of thwarting the

discovery process. In light of Response Time's deliberate and callous conduct, we conclude the sanctions imposed by the trial judge were not excessive.

■ We next address Response Time's claim that the trial judge abused his discretion in failing to attempt lesser sanctions. As set forth in the sanctions order, the trial judge considered lesser sanctions including those proposed by Response Time. The trial judge recognized that the voluntary dismissal of the fabricated claims amounted to no sanction at all. Response Time suggested that Sterling Commerce be allowed to describe Response Time's misconduct to the jury, thus hurting Response Time's claims that were unrelated to the misconduct. The trial judge correctly dismissed this option because Response Time had no claims unrelated to the misconduct. The trial judge stated:

Defendants' demonstrated willingness to testify falsely and misleadingly, to fabricate claims, defenses and evidence, to present false arguments and evidence to the Court, and to violate the Injunction Order, have completely undermined Defendants' credibility and have permeated and compromised the integrity of this entire proceeding to an extent that cannot be cured through the imposition of lesser sanctions than those imposed herein. Because of the extent and nature of Defendants' fabrication of evidence and intent to deceive the Court and Movants, and the aggressive use of threats, motions and obstructionist tactics by Defendants to conceal their wrongdoing, the Court finds that the sanctions ordered herein are not excessive and that the imposition of lesser sanctions is not appropriate or required.

The record shows the trial judge thoroughly analyzed and considered the imposition of lesser sanctions, and we agree with the trial judge's conclusion that the imposition of lesser sanctions was not appropriate.

■ Finally, we address Response Time's claim that the trial judge erred in concluding Response Time's counterclaims and defenses lacked merit. In his order, the trial judge stated:

Defendants' conduct in failing to reveal that Humphrey's status at National City had changed or the extent of such change, unreasonably obstructing the discovery process, and misrepresenting to the Court and Movants the nature and extent of Humphrey's job duties in Defendants' summary judgment motion is directly related to the defenses of Response Time and Lansky to SCI's trade secret claims, and justifies a presumption that Defendants misappropriated SCI's trade secrets and that their defenses to SCI's claims have no merit.

\* \* \*

While Defendants have shifted the Koser Claims from a breach of contract action to a quantum meruit claim sounding in equity, Defendants' false testimony about the nature, substance and history of the relationship between Response Time and Koser is directly related to the Koser Claims and justifies a presumption that the Koser Claims have no merit. The fabrication of the February 25 Letter is also directly related to the Koser Claims, and likewise justifies a presumption that the Koser Claims have no merit. . . .

Response Time contends the record does not support the trial judge's finding that its counterclaims and defenses lacked merit. In support of its contention, Response Time relies on a San Antonio court of appeals opinion reversing the trial court's judgment imposing "death penalty" sanctions on the ground that the "death penalty" sanction "is not proper punish-

ment for what was *perceived* by the court to be perjured testimony." The motion for rehearing in *Kugle v. DaimlerChrysler Corp.* was granted, however, and on August 21, 2002, the court of appeals vacated its previous opinion and issued its opinion affirming the trial court's judgment. *Kugle v. DaimlerChrysler Corp.*, 88 S.W.3d 355, 358 (Tex.App.-San Antonio Aug.21, 2002, no pet.) (en banc). In *Kugle*, the plaintiffs sued DaimlerChrysler for personal injuries alleging a defect in the steering column of the car involved in an accident. *Kugle*, 88 S.W.3d at 359. During its investigation of the accident, DaimlerChrysler learned that one of the plaintiffs told the investigating police officer the crash was the result of driver negligence. *Kugle*, 88 S.W.3d at 359. When the plaintiff later denied under oath that she made these statements, DaimlerChrysler moved for sanctions, and the trial judge imposed "death penalty" sanctions. *Kugle*, 88 S.W.3d at 365–66. Although the court of appeals originally reversed the imposition of "death penalty" sanctions, on rehearing the court of appeals stated the trial judge was entitled to make a credibility determination with regard to the plaintiff's credibility. *Kugle*, 88 S.W.3d at 366–67. Because the record supported the trial judge's findings, the court concluded he did not abuse his discretion in finding the plaintiff's testimony to be untruthful. *Kugle*, 88 S.W.3d at 366–67.

We find further support in two other opinions: *Daniel v. Kelley Oil Corp.*, 981 S.W.2d 230, 234 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) and *Vaughn v. Texas Employment Commission*, 792 S.W.2d 139, 144 (Tex.App.-Houston [1st Dist.] 1990, no writ). In *Daniel*, the plaintiff filed a sexual harassment and discrimination suit against her employer. During discovery, a dispute arose as to the authenticity of an audio cassette tape recording produced by the plaintiff. The em-

ployer moved for sanctions and to quash the admission of the tape recording. After hearing conflicting expert testimony, the trial judge determined the tape recording was fabricated and struck the plaintiff's pleadings. *Daniel*, 981 S.W.2d at 232. In upholding the sanctions, the appellate court held that the "very act of fabricating evidence strongly suggests that a party has no legitimate evidence to support her claims." *Daniel*, 981 S.W.2d at 235.

In *Vaughn*, Zelda Vaughn sued her former employer for wrongful termination and defamation, and she sued the unemployment commission for denial of benefits. When the authenticity of certain evidence was questioned, Vaughn admitted that she committed perjury and fabricated evidence in her deposition and discovery responses. *Vaughn*, 792 S.W.2d at 143. The appellees moved for sanctions, and the trial judge struck Vaughn's pleadings. The court of appeals affirmed. *Vaughn* is the rare case in which severe misconduct was admitted. So too is this case.

Due process requirements are met in this case. The fact that Response Time fabricated evidence strongly suggests that it had no legitimate evidence to support its claims. *See Daniel*, 981 S.W.2d at 235. Response Time's false interrogatory responses, the fabricated February 25th letter, and Lansky's irreconcilable testimony on Response Time's relationship with Koser justify the presumption that its counterclaims lack merit.

Response Time's continued fabrication of evidence as to Humphrey's duties at National City Bank and its obstruction of the discovery process justify the presumption that its defenses to the trade secrets claims lack merit. Moreover, we agree with the trial judge's conclusion that Response Time's extensive and prolonged coverup of the true nature of Humphrey's

work justifies the presumption that it misappropriated Sterling Commerce's trade secrets.

We affirm the trial court's judgment.