**In re Satish GUPTA, SB International, Inc., Trinity Recycling, Inc., and Manish Gupta, Relators.**

No. 01–06–00678–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 29, 2007.

Aaron Russell Miller, Richard A. Smith, Jeremy A. Fielding, Michael P. Lynn, Lynn Tillotson & Pinker, L.L.P., Deborah G. Hankinson, Law Offices of Deborah Hankinson PC, Dallas, TX, for Relators.

Michael Choyke, Wright, Brown & Close, L.L.P., Sean Gorman, Chris Lacy, Stephen M. Ryan, LeBoeuf, Lamb, Greene & MacRae, L.L.P. Houston, TX, Ed D. Lieck, Anahuac, TX, for Real Party in Interest.

Panel consists of Justices NUCHIA, JENNINGS, and HIGLEY.

**OPINION**

LAURA CARTER HIGLEY, Justice.

Relators, Satish Gupta, SB International, Inc., Trinity Recycling, Inc., and Manish Gupta have filed a petition for writ of mandamus, challenging the trial court's order striking all of their pleadings in the underlying lawsuit[1] brought against them by real party in interest, U.S. Denro Steels, Inc., doing business as Jindal United Steel Corporation. We deny the petition for writ of mandamus.

We vacate our order of July 26, 2006, staying the underlying proceedings.

Justice JENNINGS, concurring.

TERRY JENNINGS, Justice, concurring.

I concur in the majority's decision to deny the petition for writ of mandamus filed in this Court by relators, Satish Gupta, SB International, Inc. ("SB"), Trinity Recycling, Inc. ("Trinity"), and Manish Gupta, challenging the trial court's order striking all of their pleadings in the underlying lawsuit brought against them by real party in interest, U.S. Denro Steels, Inc. doing business as Jindal United Steel Corporation ("Jindal").

However, I disagree with the majority that this significant decision does not merit a written explanation from this Court. This is an important and extraordinary case, which requires an opinion with precedential value. When denying mandamus relief, although a court is "not required to" hand down an opinion, it certainly may do so when appropriate. TEX.R.APP. P. 52.8(d). Just because we are not required to do something, does not mean that we should not act when action is appropriate.

Relators, in four issues, contend that they have no adequate remedy by appeal and that the trial court clearly abused its discretion in entering death penalty sanctions against them not only on Jindal's claims, *but also relators' counterclaims.* As noted below, the factual allegations underlying the parties' claims are complex, the subject matter of the discovery disputes is significant, and Jindal's allegations about relators' flagrant bad faith in their abuse of the discovery process are gravely

---

1. The underlying case is *U.S. Denro Steels d/b/a Jindal United Steel Corporation v. Satish Gupta, SB International, Inc., Trinity Recycling, Inc. and Manish Gupta*; and *SB International, Inc. v. Jindal Enterprises, LLC, d/b/a* *Jindal Stainless Corporation*; Cause No. 19790, in the 344th District Court of Chambers County, Texas, the Honorable Carroll E. Wilborn, Jr., presiding.

serious. Above all, the trial court's award of death penalty sanctions in this case is considerable, implicating the Due Process Clause of the United States Constitution and the Due Course of Law provision of the Texas Constitution.[1]

Moreover, Texas Rule of Appellate Procedure 47 "is applicable to an order or opinion by a court of appeals" concerning its action on a petition for writ of mandamus. TEX.R.APP. P. 52.8(d). Here, our decision to deny relators' petition in regard to Jindal's claims and relators' *counterclaims* applies existing rules to a novel fact situation likely to recur in future cases. *See* TEX.R.APP. P. 47.4(a). Also, our decision involves issues of constitutional law and other legal issues important to the jurisprudence of Texas. *See* TEX. R.APP. P. 47.4(b). Accordingly, an explanation of this Court's decision in this case is necessary.

## Factual and Procedural Background

Jindal makes steel plate at its steel rolling mill, and steel scrap is a by-product of its rolling process. SB and Trinity are in the business of buying and reselling steel, including steel scrap. SB and Trinity are wholly owned by SBI Trading, Inc., which is owned by Satish Gupta, his wife, and their children. Satish is Trinity's president and serves on SB's board of directors.

### The Underlying Lawsuit

In the underlying lawsuit, Jindal asserts claims against relators for fraudulent inducement, conversion, violation of the Texas Theft Liability Act,[2] civil conspiracy, an accounting, and a sworn account. In their counterclaims, SB and Trinity assert claims against Jindal for breach of contract, money had and received, quantum meruit, unjust enrichment, fraudulent inducement, tortious interference, civil conspiracy, and a sworn account.

### Jindal's Allegations

Jindal alleges that, in 1997, SB and Trinity began buying steel scrap generated at Jindal's mill for a fixed price per ton. In 1998, Jindal entered a contract with SB and Trinity governing the "removal of steel scrap by truck" (the "Steel Scrap Agreement"). From 1998 to 2001, Manish Gupta, Satish's cousin, oversaw SB's operations at the mill from an office in Jindal's administrative building. Manish established a process in which trucks were used to remove scrap from the mill. These trucks were weighed empty as they entered the mill, and they were weighed again, after they were loaded with scrap, as they left the mill. Four copies of the weight ticket were generated: the truck driver kept two copies, and the guard at Jindal's gate kept the other two other copies, one of which was to be forwarded to Jindal's accounting office so that Jindal could prepare and send an invoice to SB.

In mid–1998, Manish requested that Jindal allow SB and Trinity to ship "a small amount of scrap out of the plant by railcar." Manish represented that such shipments would be "rare" because of higher transportation costs. Manish also represented that weight tickets would be generated by the railroad company. Jindal agreed to the arrangement, but required that Manish deliver the railroad company's weight tickets to Jindal and notify Jindal prior to loading a railcar.

In late 2000, Jindal discovered that Manish had been "intercepting the truck weight tickets" that should have been delivered to Jindal and, consequently, SB and Trinity were not invoiced for all the scrap metal they removed from Jindal's

1. *See* U.S. CONST. amend. XIV; TEX. CONST. art. I, § 19.

2. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 134.001–.005 (Vernon 2005).

mill. Specifically, Jindal alleges that from April 1999 through April of 2002, Satish and his companies removed approximately 200 railcars of scrap from Jindal's facility, but only 30 of those railcars were reported to Jindal, resulting in the theft of over 14,000 tons of scrap valued at approximately $1,362,090.20.

*SB and Trinity's Allegations*

In their Second Amended Counterclaims against Jindal, SB and Trinity acknowledge that they had a contract to purchase steel scrap from Jindal's mill for resale. However, SB and Trinity allege that, under a separate agreement, they had an exclusive contract for the purchase and resale of stainless steel plate generated by the mill. Under this "Stainless Steel Plate Agreement," Jindal billed SB and Trinity for stainless steel plate produced at the mill, for which SB and Trinity paid in advance. After a sale to a third party, Jindal was required to credit SB and Trinity the price difference. Moreover, Jindal was required to pay SB and Trinity a commission and reimburse them for expenses, including freight costs. Jindal failed to issue proper credits and pay commissions and expenses in an amount over $400,000. SB and Trinity also claim that Jindal owes them $250,000 for repayment of cash advances.

SB and Trinity further allege that in the summer of 2001, Jindal formed a joint venture with Southern Texas Steel ("STS"). Under the joint venture agreement, Jindal's mill "was to be used exclusively for filling steel plate orders placed by STS," and STS would own all the resulting scrap metal and steel plates. STS then entered into an exclusive scrap metal recovery agreement with a third party.

Subsequently, in late 2001, Jindal informed SB and Trinity that there were unpaid balances due on their accounts and "threatened to cut off" their supply of scrap metal. Relators claim that Jindal wrongfully evicted SB and Trinity and "cut off their supply of scrap without prior notice." Because SB and Trinity needed the scrap to operate their business, they negotiated a "new exclusive purchase agreement" with Jindal, through its agent, Indresh Batra, who offered SB and Trinity "the exclusive right to the scrap from the [m]ill for the next three (3) years in return for payment of $100,000.00 (the 'Settlement Amount')." Jindal then offered a "one year renewal" subject to additional renewals. The payment of "the Settlement Amount was to be in full satisfaction of all alleged, and then disputed, outstanding balances due." Not knowing that a third party already had the exclusive right to purchase the scrap, SB and Trinity "paid more than $100,000" to settle the accounts and obtain the exclusive rights.

After STS and Jindal, on November 16, 2001, demanded payment of outstanding accounts from SB and Trinity and told them to vacate the mill, SB and Trinity again negotiated an agreement to resolve the ongoing dispute, and on February 15, 2002, SB entered into an agreement with STS for a "one year exclusive right to purchase prime carbon steel plate produced at the Mill for resale" (the "Carbon Steel Plate Agreement").[3] The Carbon Steel Plate Agreement required STS to

---

**3.** SB has sued STS regarding the February 15, 2002 contract in Dallas County. *SB International, Inc. v. Southern Texas Steel, LLC,* Cause No. 02–04436, in the 191st District, Dallas County, Texas. SB has also sued Indresh Batra and P.R. Jindal, who owns Jindal, regarding the settlement negotiations made in 2001 and surrounding the February 15, 2002 in the United States District Court for the Northern District of Texas, Dallas Division, Civil No. DS 1936. *SB International, Inc. v. Batra,* Civil No. DS 1936, in the Northern District of Texas, Dallas Division.

sell SB the carbon steel plate at preferred, first tier pricing. In exchange, SB agreed to pay STS "$1,013,309.40 in installments over ninety days." By May 7, 2002, SB had paid STS $800,000, but STS had not delivered any carbon steel plate.

*Partial Summary Judgments*

The trial court granted relators' motion for partial summary judgment, rendering a take-nothing judgment as to Jindal's tort claims because it concluded that the claims were "all, in substance, breach of contract claims clothed in tort language." The trial court also granted Jindal's motion for partial summary judgment, rendering a take-nothing judgment on SB and Trinity's breach of contract and fraudulent inducement claims related to the 2001 Agreement where SB and Trinity paid $100,000 for the exclusive right to scrap metal for 3 years.

**The Discovery Disputes**

Jindal filed suit in May 2002, and, in July 2002, served its first request for production on relators, asking for all weight tickets, documents, and records indicating the total amount of steel scrap that relators removed from the mill by truck and railcar between 1997 and 2002. Relators produced one box of documents, containing weight tickets. When Jindal filed a motion to compel, relators produced two additional boxes of documents, and counsel for relators stated that "[a]fter further clarification with the Defendants, *there are presently no documents* (other than those that constitute or contain attorney/client communications or work product of the [relators'] attorneys) *being withheld from production.*" (Emphasis added.)

Jindal subsequently served interrogatories to relators, and, after reviewing the contents of the two additional boxes and relators' answers, filed a motion to compel responses to interrogatories and production of documents. Jindal asserted that despite relators' representations that no documents were being withheld, relators failed to provide responsive documents for numerous requests. Satish responded to this motion with an affidavit, in which he testified that relators did not generate or keep documents showing the amount of steel scrap removed from Jindal's facility, other than those already produced. After a hearing, the trial court ordered relators "to make available for copying, downloading, or replicating by electronic format all computerized accounting records for [SB] and [Trinity] from 1998 to 2001 including but not limited to its QuickBooks accounting data … no later than August 28, 2003."

In response to this order, relators, on October 28, 2003, produced five diskettes containing accounting information. Jeff Compton, Jindal's Certified Public Accountant and certified fraud examiner, concluded that the diskettes did not contain a complete copy of relators' pertinent accounting information.

On March 5, 2004, Jindal filed a motion to compel and for sanctions, in which it asserted that the diskettes did not contain the actual accounting records of SB and Trinity. Jindal attached to its motion Compton's affidavit, in which he testified,

> [T]he entries were maintained elsewhere and transferred to QuickBooks after the fact with an artificial rather than an actual date or recordation. This evidence suggests that the accounting records produced by [relators] are not the actual accounting records of the company, but represent a selective modification of such records.
>
> . . . .
>
> I am reasonably certain we received neither all the accounts maintained in QuickBooks nor all the computerized accounting records for [SB] and [Trinity].

Jindal requested that the trial court order relators to produce "all computerized accounting records, including the original, unaltered, and complete accounting data in QuickBooks as used by the company for its business purposes from 1998 to 2001." At a March 2004 hearing, the trial court again ordered relators to produce the requested information, and incorporated its ruling in a May 2004 order.

Relators subsequently produced four additional computer files containing purchase and sales information. Again not satisfied that relators had produced a complete set of accounting information, Jindal requested the deposition of SB's controller, Moiz Ali Bhai. After agreeing on a deposition date, SB and Trinity informed Jindal that Bhai would not be produced, and did not offer any alternative dates. On June 15, 2004, Jindal filed its "Third Motion to Compel."

In response to this motion, relators agreed to a July 2004 order, which provided,

> On July 16, 2004, [SB] and [Trinity] will make available to Jindal's representatives the computer hardware on which [SB] and [Trinity] maintain their computerized accounting records and allow Jindal's representatives to copy, download or replicate by electronic format all of their computerized accounting records from 1998 to 2001.
>
> . . . .
>
> The Court will impose sanctions as it determines appropriate in its discretion for non-compliance with this order.

In the order, the trial court also (1) ordered the depositions upon written questions of relators' accounting firm and railroad customers; (2) required relators to instruct their accountants to cooperate; (3) compelled relators to produce Bhai for deposition; (4) ordered relators to amend their interrogatory answers; and (5) over-

ruled relators' objections to specific requests and ordered relators to amend their answers to state that all responsive documents had been produced.

On July 16, 2004, relators produced to Jindal a computer which they represented as "THE computer" on which they maintained their accounting data from 1998 through 2001. However, relators did not produce "the server" with the "original" accounting information. Rather, they produced a desktop computer loaded with Windows 98, Excel, and some QuickBooks data. After analyzing the computer, Jindal's experts concluded that it contained a hard drive that had been manufactured in June 2004 and that the data on the computer had been loaded onto it within 48 hours before its production.

Bhai later testified that he had never used this computer, and he explained that all of the QuickBooks data maintained by SB and Trinity had been deleted in May or June 2002 after Bhai gave a backup disk to Satish. Furthermore, Satish's teenage son, Arish, testified that the hard drive on "THE computer" had been replaced only days before it was produced and that he had subsequently loaded the software onto the new hard drive. Although Arish did not load any data onto the computer, he saw Manish working on the computer before its production.

In October 2004, Jindal filed a "Supplemental Motion for Sanctions," emphasizing that SB and Trinity had "blatantly disregard[ed]" three court orders. At the December 2004 hearing, Jindal accused relators of "phonying up" the produced computer and accused Satish of losing "or destroying" the backup disks given to him by Bhai. Satish testified, in contradiction to Bhai, that Bhai told him that the computer was "THE computer" used by SB's accounting department. Relators further

represented that the data was "lost" and that the documents that they had already produced included the evidence that Jindal sought.

At the conclusion of the hearing, the trial court stated,

> I am extremely troubled by this record and the struggle that we have had over getting the information. I don't know how many hours you folks have been before this Court.
>
> . . . .
>
> This discovery dispute has been going on for a long period of time.... I wanted the computer that was used for this period of time so we could look at those records because computer experts can also look at those records and see what things have been deleted. There is a lot you could have done with computers. We wouldn't be having this trouble. That, I think is sanctionable.

Based on the "substantial" delay and "opportunities to come clean," and in light of the amount in controversy, Jindal requested sanctions of $10,000 in order to "send a message." The trial court agreed and imposed the $10,000 sanction, which relators paid.

In April 2005, Manish appeared for deposition, where he refused to answer any substantive questions, asserting his Fifth Amendment[4] privilege against self-incrimination. In June 2005, relators again sent Jindal five diskettes, which were identical to those produced in October 2003, and relators represented these diskettes to be the source of the information on the produced computer. However, according to Jindal's computer expert, as well as relators' own computer expert, it appeared that the computer's hard drive had been copied from another hard drive, not from the diskettes.

Jindal noticed the depositions of SB and Trinity in August 2005, and both SB and Trinity designated Manish as their corporate representative. When Manish appeared for deposition, he again invoked his Fifth Amendment privilege, refusing to answer substantive questions, such as: "Is it true that you intentionally phonied up the computer that was produced to Jindal in this case on July 16, 2004?"

On August 30, 2005, the trial court considered Jindal's "Second Motion for Sanctions," in which Jindal sought death penalty sanctions. Jindal noted that "SB's and Trinity's accounting records are objective data that will prove how much steel scrap SB took from Jindal's plant" and that the "only source" for the accounting data was the diskettes Bhai gave to Satish. Jindal asserted that as of July 2004, "SB and Trinity had in their possession a complete copy of the accounting data that Jindal is seeking, and they only produced a phonied-up computer with incomplete, misleading, and useless accounting data." Jindal also complained about Manish's refusal to answer questions, even when designated as SB's and Trinity's corporate representative. Based on Bhai's testimony, Jindal argued that relators intentionally deleted accounting information from their server after the lawsuit was filed.

In response, relators presented their expert, Greg Schuelke, a Certified Public Accountant, who said that he is usually hired to do damage analysis for various types of companies and industries. Schuelke testified that Manish had given him a list of 638 railcar scrap shipments (the "Manish list"). Schuelke stated that after certain trucks had been loaded and weighed, the drivers received weight tickets and then, rather than leave the mill, made U-turns back into the mill, where the

4. U.S. Const. amend. V.

scrap metal was transferred to railcars and shipped. He asserted that the absence of bills of lading for these shipments supported his theory that these shipments left the mill via railcar, because truck shipments had bills of lading. Moreover, according to Schuelke, an Excel version of the Manish list was kept by Manish in the regular course of business as far back as 1999.

Relators asserted that their discovery problems resulted from a series of mishaps and miscommunications about SB's and Trinity's ordinary business practices. The trial court disagreed, stating,

> It's hard for this Court to accept ... that this is just the normal, bungling problems with the computer. I am very familiar with computers. I am very familiar with what I've heard here today. To a certain extent, I understand everything that has been testified to. And I think the reason I haven't granted death penalty sanctions is there is a skunk in this courtroom, but I am not going to burn down the barn to get rid of it. That will not happen, but I am granting additional sanctions of $50,000....

Relators paid the sanction.

Jindal then sought production of the computer that Manish used to make the Manish list. However, in an affidavit dated May 11, 2006, Manish denied having in his possession "a computer that was used by [him] to conduct SB's business with [Jindal]." He stated that he used a desktop computer, which he referred to as the "Mill Computer." He further stated, "The Mill Computer did not contain any accounting software or other software which could be used or was used to track information related to the purchase or sale of steel scrap from Jindal United. Moreover, I never entered any such information into the Mill Computer." Manish claimed that he had sent handwritten worksheets show-ing steel scrap purchases to SB's Dallas offices. Finally, he stated that he donated the Mill Computer to charity in December 2001 and he did not keep an electronic copy of any information stored on it.

When Jindal confronted relators with Schuelke's and Manish's differing accounts regarding the creation of the Excel version of the Manish list, relators informed Jindal that Schuelke's testimony was incorrect and that the Manish list was not kept contemporaneously with actual shipments. Rather, the Manish list was created based on "informal, handwritten" notes maintained by Manish.

On May 24, 2006, Jindal filed its "Third Motion for Sanctions," in which it again argued for death penalty sanctions. Jindal noted that although Schuelke testified that the Manish list was created from 1999 through 2000 and that he "was led to believe this was something [Manish] was maintaining on an ongoing basis," the list had never been provided to Jindal. In fact, Satish had previously testified that relators had never generated or kept any such document. Also, Jindal noted that Manish's affidavit testimony contradicted Schuelke's testimony about when and how the Manish list was actually created. Moreover, Jindal complained that relators had, during the four years of the case's pendency, failed to produce Manish's handwritten notes that relators asserted were the basis for the Manish list. In response, relators, who had engaged new trial counsel, filed a motion for reconsideration of the prior sanctions. In their motion, relators asserted that "the perceived abuses surrounding the computer and the produced electronic accounting data can all be traced back to a single inaccurate representation of fact made by [relators' previous trial] counsel ... to Plaintiff's counsel." The trial court heard evidence on

both motions over the course of four days in May and July 2006.

Jindal noted that it had received the handwritten Manish list only in late May 2006 and that relators should have produced it years earlier. Relators asserted that they had previously produced identical information to Jindal in other forms. At the hearing, Manish testified that "I was maintaining this [list] when the trucks on the rail in '99—when we started shipping trucks, loaded them, put them on the scale, weighed them and put them behind. So I had to keep track of that. So that is when I started preparing this list." He explained the U-turn procedure and that the entries on his list corresponded to railcar shipments, as opposed to truck shipments as those would have been accompanied by bills of lading. Manish also stated that the list was produced to Jindal on May 2006, because he had transcribed his list into an Excel spreadsheet, which he gave to relators' attorney, and no one had previously asked him for the handwritten list.

Compton, Jindal's accountant and fraud examiner, testified that he had reviewed bills of lading from North Star Steel, one of relators' customers, who received scrap metal from relators only by truck. Compton discovered that 552 of the 638 entries on Manish's list corresponded to truck shipments to North Star Steel, not railcar shipments, as represented by Manish. He then concluded that Manish had fabricated the list, which constituted fraud.

Over the four days of the hearing, the trial court heard testimony from Satish, Manish, Arish, Compton, Schuelke, Dwight Lowe (the owner of the trucking company used by relators), Mark Stromberg (relators' previous trial counsel), Lamp, Bhai, and Odom. The evidence covered scrap-metal collection, shipping practices, recordkeeping, forensic analysis, computer file storage, copies of computer information, accounting data, accounting practices, and the course of litigation and discovery. In short, the trial court gave the issues a full and thorough hearing.

On July 10, 2006, the trial court granted Jindal's motion for death penalty sanctions, writing,

I have granted orders compelling discovery and, even on a few occasions, administered sanctions when needed. This case, however, is a case of first impression for this Court. From the initiation of discovery in this case, it has been clear that the focus of the case was accounting for scrap steel at the plant in question. That has never been misunderstood. I feel that [the relators' attorney], a very capable attorney, understood this and so did his clients and the plaintiffs. We have struggled through assertions of the 5th amendment, a long search for the original computer with the original records and the production by the defendants of a computer that was clearly not responsive to the Court's rulings. I do not believe that anyone in this case misunderstood what was needed. I have previously granted the largest sanctions ever assessed by this Court in this case against these defendants. These sanctions were paid. I can find no reason to set aside or withdraw the previous orders of the Court on prior sanctions and the defendants' motion for reconsideration is denied.

Regarding the Manish handwritten list and the Excel spread sheet, a reading of the testimony at the previous hearings on this matter clearly indicates that the defendants expected the plaintiff to rely upon this evidence as an explanation that payment had been made for the allegedly missing scrap steel. There was no confusion in the testimony of Manish Gupta that these trucks never

left the plant, made the "U" turn and the steel contained therein subsequently loaded on rail cars. This appears to be untrue. Additionally, Manish Gupta's testimony was that there were no bills of lading for the trucks in question. Subsequent testimony by and through lay witnesses and experts indicate that the great majority of these trucks were sent to North Star with bills of lading not to the rail cars in question. I do not find the explanation in defendant's e-mail to be sufficient to explain away the obvious use of the list and spread sheet to misrepresent the facts or to deceive. Additionally, I find the testimony of Dwight Lowe to be less than forthright or credible on these issues.

Accordingly, and based upon all the evidence presented from hearings on the very first Motion to Compel to our most recent hearing, concluded on July 3, 2006, and from the totality of the circumstances and evidence before the Court, I feel that Plaintiff's request to strike all pleadings of the defendants should be and is granted.

Jindal subsequently moved for default judgment. Relators then petitioned this Court for a writ of mandamus, and we ordered a temporary stay in the underlying case.

### Standard of Review

Mandamus is an extraordinary remedy, which is available only when (1) a trial court clearly abuses its discretion and (2) there is no adequate remedy by appeal. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex.2004) (orig.proceeding); *In re Unitec Elevator Servs. Co.*, 178 S.W.3d 53, 57 (Tex.App.-Houston [1st Dist.] 2005, orig. proceeding). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992) (orig.proceeding). With respect to a trial court's determination of legal principles, "a trial court has no 'discretion' in determining what the law is or applying the law to facts." *In re Prudential*, 148 S.W.3d at 135 (quoting *Walker*, 827 S.W.2d at 840). Thus, a trial court abuses its discretion if it issues a discovery sanction in an arbitrary or unreasonable manner, or without reference to guiding rules and principles. *In re Colonial Pipeline Co.*, 968 S.W.2d 938, 941 (Tex.1998) (orig.proceeding).

Moreover, the requirement that persons seeking mandamus relief establish the lack of an adequate remedy by appeal is a "fundamental tenet" of mandamus practice. *Walker*, 827 S.W.2d at 840. The writ will issue "only in situations involving manifest and urgent necessity and not for grievances that may be addressed by other remedies." *Id.*

### Adequate Remedy by Appeal

In their fourth issue, relators argue that they do not have an adequate remedy by appeal because when the trial court struck relators' pleadings, it did not issue a final, appealable judgment.

The Texas Supreme Court has held that "[w]hen a trial court imposes discovery sanctions which have the effect of precluding a decision on the merits of a party's claims—such as by striking pleadings, dismissing an action, or rendering default judgment—a party's remedy by eventual appeal is inadequate, unless the sanctions are imposed simultaneously with the rendition of a final, appealable judgment." *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 920 (Tex.1991) (orig.proceeding). If such a sanctions order is not immediately appealable, it will be reviewable by petition for writ of mandamus. *Id.*

In this case, the trial court granted the death penalty sanctions without simultaneously rendering a final, appealable judgment. Thus, relators' remedy by appeal from a final judgment is inadequate. *See id.*

Accordingly, I would sustain relators' fourth issue.

## Sanctions

Sanctions are to be used "to assure compliance with discovery and deter those who might be tempted to abuse discovery in the absence of a deterrent." *Cire v. Cummings,* 134 S.W.3d 835, 839 (Tex.2004). Sanctions may also be used to punish abusers. *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 849 (Tex.1992). Trial courts have broad authority to impose sanctions for abuse of the discovery process:

> If the court finds a party is abusing the discovery process in seeking, making, or resisting discovery or if the court finds that any interrogatory or request for inspection or production is unreasonably frivolous, oppressive, or harassing, or that a response or answer is unreasonably frivolous or made for purposes of delay, then the court in which the action is pending may, after notice and hearing, impose any appropriate sanction authorized by paragraphs (1), (2), (3), (4), (5), and (8) of Rule 215.2(b). Such order of sanction shall be subject to review on appeal from the final judgment.

TEX.R. CIV. P. 215.3. If a party fails to comply with proper discovery requests or to obey an order to provide or permit discovery, a trial court may, after notice and a hearing, make such orders "in regard to the failure as are just," including:

> an order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing

with or without prejudice the action or proceedings or any part thereof, or rendering a judgment by default against the disobedient party.

TEX.R. CIV. P. 215.2(b)(5).

There are two components to measuring whether an imposed sanction is "just." *TransAmerican Natural Gas Corp.,* 811 S.W.2d at 917. First, a direct relationship must exist between the offensive conduct and the sanction imposed. "This means that a just sanction must be directed against the abuse and toward remedying the prejudice caused the innocent party. It also means that the sanction should be visited upon the offender. Second, just sanctions must not be excessive." *Id.* They should be only as severe as is necessary to satisfy legitimate purposes. *Id.* Thus, "[t]he punishment should fit the crime" and "courts must consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote compliance." *Id.* The Texas Supreme Court has explained that the imposition of very severe sanctions is not only limited by these standards, but also by constitutional due process [5]:

> Discovery sanctions cannot be used to adjudicate the merits of a party's claims or defenses *unless a party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit.* However, if a party refuses to produce material evidence, despite the imposition of lesser sanctions, the court may presume that an asserted claim or defense lacks merit and dispose of it. Although punishment and deterrence are legitimate purposes for sanctions, they do not justify trial by sanctions. Sanctions which are so severe as to preclude presentation of the merits of the case *should not be assessed absent a*

---

5. *See* U.S. CONST. amend. XIV; TEX. CONST. art. I, § 19.

*party's flagrant bad faith* or counsel's callous disregard for the responsibilities of discovery under the rules.

*Id.* at 918 (emphasis added) (citations omitted).

Thus, "[s]triking pleadings is a harsh sanction that must be used as a last resort after the trial court has considered lesser sanctions, and that in all but the most egregious and exceptional cases, the trial court must test lesser sanctions before resorting to death penalty sanctions." *Cire,* 134 S.W.3d at 842. However, "in cases of exceptional misconduct . . . the trial court is not required to test lesser sanctions before striking pleadings . . . so long as the record reflects that the trial court considered lesser sanctions before striking pleadings and the party's conduct justifies the presumption that its claims lack merit." *Id.*

### Flagrant Bad Faith

In their first issue, relators argue that the trial court clearly abused its discretion in administering death penalty sanctions against them because "the conduct found by the court did not justify any presumption that relators' defenses and counterclaims were meritless." They assert that the trial court, in granting death penalty sanctions, expressly found "only three things": (1) that Manish's testimony that the trucks never left the plant "appears to be untrue"; (2) that Manish's testimony that "there were no bills of lading" was contradicted by lay witnesses and experts; and (3) that Dwight Lowe's testimony was "less than forthright and credible." Relators conclude that these limited findings do not justify death penalty sanctions.

However, in conducting a review of the sanctions orders in this mandamus proceeding, this Court is "not bound by [the] trial court's findings of fact and conclusions of law; rather, appellate courts must independently review the entire record to determine whether the trial court abused its discretion." *Am. Flood Research, Inc. v. Jones,* 192 S.W.3d 581, 583 (Tex.2006); *see also Chrysler Corp.,* 841 S.W.2d at 852. This includes "the evidence, arguments of counsel, the written discovery on file, and the circumstances surrounding the party's alleged discovery abuse." *Daniel v. Kelley Oil Corp.,* 981 S.W.2d 230, 234 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). Moreover, the trial court, in its sanctions order, specifically stated that its ruling was "based upon all the evidence presented from hearings on the very first Motion to Compel to our most recent hearing, concluded on July 3, 2006, and from the totality of the circumstances and evidence before the Court." Accordingly, an examination of the entire record is appropriate to determine whether the trial court abused its discretion in granting death penalty sanctions. *See id.*

As noted by Jindal, from the outset of its lawsuit, it was clear that the "two key questions" were (1) how much steel scrap relators removed from Jindal's mill by railcar or otherwise, and (2) whether relators paid for all the scrap removed. The record demonstrates that although Jindal sought this information within two months of filing suit, it was unable to get responsive documents and answers from relators for almost four years.

After Jindal filed its first motion to compel, relators represented that "there are presently no documents . . . being withheld from production." As the detailed history above illustrates, this representation was false. In August 2003, in its first of many discovery orders, the trial court ordered relators to produce "all computerized accounting records for [SB] and [Trinity] from 1998 to 2001." When relators produced five computer diskettes after the court-ordered deadline, Jindal's accountant and fraud examiner determined that they

did not contain the pertinent accounting information.

Unable to obtain the requested discovery, Jindal filed yet another motion to compel production of "all computerized accounting records, including the original, unaltered, and complete accounting data in QuickBooks as used by the company for its business purposes from 1998 to 2001." After relators failed to comply with another order, Jindal filed another motion, and relators agreed to an order requiring them to produce their computer hardware and computerized accounting records from 1998 to 2001. Even when the trial court threatened relators with sanctions, relators still failed to comply.

When relators finally produced "THE computer" purportedly containing the pertinent accounting data, relators produced a computer containing a hard drive manufactured in June 2004 with data loaded onto it less than 48 hours before the computer's production. Even Bhai, SB's controller, confirmed that he had never used this computer, stating that the QuickBooks data maintained by SB and Trinity had been deleted shortly after the filing of this lawsuit and that he gave a backup disk containing the pertinent information to Satish. A copy of this backup disk was never produced. Satish's son, Arish, also conceded that he saw Manish working on the computer before its production.

"[E]xtremely troubled" by the struggle to get responsive information and the computer used during the relevant time period so that computer experts could determine what information had been deleted, the trial court finally imposed sanctions in December 2004. During the hearing, Satish claimed, despite Bhai's testimony, that Bhai had told him the produced computer was "THE computer" used by SB's accounting department. Although relators later sent Jindal five diskettes, claiming

them to be the source of the information on the produced computer, their own expert agreed that the computer's hard drive appeared to have been copied from another hard drive, not the diskettes.

During a subsequent hearing on Jindal's second sanctions motion, Schuelke, relators' accounting expert, disclosed, for the very first time in this case, the existence of the "Manish list" as well as the "U-turn" defense. Moreover, Schuelke represented that Manish kept an Excel version of the Manish list in the regular course of business as far back as 1999. At the conclusion of the hearing, the court rejected relators' "miscommunication" defense, and imposed an additional sanction of $50,000. When Jindal requested the computer used to prepare the Manish list, Manish denied using a computer to track purchases and sales of steel scrap, denied entering this information into a computer, and claimed Schuelke's testimony was incorrect. Contrary to their own expert's testimony, relators asserted that the Manish list was not created in the regular course of business, but instead was based on "informal, handwritten" notes, which indisputably had not been previously produced.

In regard to the substance of the Manish list, Jindal's fraud examiner testified that many of the entries on the list did not correspond to railcar shipments, and instead corresponded to truck shipments. He concluded that the list had been fabricated.

It was only after the hearing on Jindal's third motion for sanctions, which spanned four days and included testimony from all relevant parties, and after the court's two, previous monetary sanctions, that the trial court finally imposed death penalty sanctions, emphasizing that the discovery issues were clearly understood from the commencement of the case. The trial court obviously rejected relators' assertion

that the perceived discovery abuses were grounded in an inaccurate representation made by relators' previous trial counsel or in any misunderstanding. The court noted its struggle through relators' assertions of the Fifth Amendment, the lengthy search for the original computer and records, and the production of a computer "that was clearly not responsive." The court further noted that the testimony supporting the U-turn defense appeared to be untrue, and flatly stated that relators could not "explain away the obvious use of the list and spreadsheet to misrepresent the facts and deceive."

Our supreme court has recently considered the imposition of death penalty sanctions. In *Cire*, Cummings filed a legal malpractice suit against Cire, and, during discovery, testified that she had tape-recorded several conversations with Cire. 134 S.W.3d at 837. The trial court entered several orders compelling production of the audiotapes, but Cummings failed to comply. *Id.* Cire filed a motion to strike Cummings's pleadings, and at the sanctions hearing, although Cummings denied destroying the audiotapes, Cire presented evidence that Cummings had burned them. *Id.* The supreme court explained that, "[o]n this record, it was within the trial court's discretion to determine that Cummings deliberately destroyed dispositive evidence; thus, death penalty sanctions are warranted in this exceptional case." *Id.* at 841.

Similarly, here, the record reveals that relators did more than repeatedly fail to comply with the trial court's orders to furnish responsive information. Although, as relators note, the trial court did not expressly state "that Manish committed perjury or intentionally fabricated" evidence, the trial court was not required to make these express findings before issuing death penalty sanctions. Contrary to rela-

tors' arguments, there is evidence in the record that supports an implied finding by the trial court that Satish and Manish perjured themselves and tampered with evidence critical to Jindal's claims and relators' defenses and counterclaims. *See* TEX. PEN.CODE ANN. §§ 37.03, 37.09(a)(1) (Vernon 2003).

From all of the above evidence, the trial court could have reasonably concluded that relators purposefully hindered the discovery process for almost four years to evade answering the simple question of how much steel scrap they removed from Jindal's facility. It was within the trial court's discretion to conclude that relators had intentionally made misrepresentations to the court about the existence and condition of this evidence. It was also within the trial court's discretion to conclude that relators had even gone so far as to fabricate evidence to mislead Jindal and the court. Ample evidence in this record supports an implied finding that relators acted in flagrant bad faith during the discovery process and in their failure to comply with the court's orders. I would hold that the evidence of relators' hindrance of the discovery process in this exceptional case justifies a presumption that their claims and defenses lack merit. *See Cire*, 134 S.W.3d at 842–43; *TransAmerican Natural Gas Corp.*, 811 S.W.2d at 918.

Accordingly, I would overrule relators' first issue.

### Direct Relationship Between Offensive Conduct and Sanctions

In their second issue, relators argue that the trial court abused its discretion in imposing death penalty sanctions because there is no direct relationship between the offensive conduct and the sanctions imposed. They assert that sanctions "for the supposedly offensive conduct of Manish would be improperly visited" on Satish, SB, and Trinity. They also assert that the

death penalty sanctions improperly strike their counterclaims.

Here, the trial court was not concerned solely with the offensive conduct of Manish. In its sanctions order, the trial court specifically stated that its ruling was "based upon all the evidence presented from hearings on the very first Motion to Compel to our most recent hearing, concluded on July 3, 2006, and from the totality of the circumstances and evidence before the Court." As illustrated above, there was ample evidence of the flagrant bad faith of each of the relators in their four-year effort to hinder discovery. Moreover, both SB and Trinity designated Manish as their corporate representative.

In regard to their counterclaims, relators further argue that the trial court's sanction is overbroad because their counterclaims are "legally and factually distinct" from Jindal's claims and are not implicated by any of the alleged misconduct. They assert that their counterclaims, filed on May 8, 2006, "have no bearing on any issues presented in Plaintiff's motion for death penalty sanctions." However, even relators acknowledge in their petition that "the counterclaims against [Jindal], at a minimum, express claims that are a set-off or recoupment against the claims asserted by [Jindal]." Relators further concede, in regard to their counterclaims arising out of the Carbon Steel Plate Agreement, that the parties negotiated the agreement in 2001, after their relationship turned sour, in an attempt to resolve "the dispute over the scrap contract and the outstanding accounts receivable balance." This supports Jindal's assertion that its claims and relators' counterclaims, even if factually distinct, arise out of the same set of circumstances. As Jindal notes in its response, when the trial court raised the possibility of severing relators' counterclaims, rela-

tors maintained that their counterclaims were "largely intertwined." Thus, to the extent relators' newly asserted counterclaims constitute a set-off, recoupment, or a settlement of the parties' original scrap metal dispute or arise out of the same set of circumstances as Jindal's and relators' original claims, the trial court could have reasonably concluded that relators' conduct in hindering Jindal's discovery was relevant to these counterclaims.

More importantly, the discovery that Jindal unsuccessfully pursued on its claims against relators, including accurate accounting records from relators, is directly related to relators' counterclaims. Even assuming that Jindal's claims and relators' counterclaims might be supported or defended by evidence specific to each claim, the key, discoverable information for both the claims and counterclaims necessarily comes from the same source—relators' accounting records. But, as established by the record and as noted by the trial court in its orders, the trial court imposed the monetary and death penalty sanctions against relators for their fabrication of accounting evidence and their failure to produce, over a four-year period, accurate accounting records. Reliable accounting records from relators would have been critical to substantiating or defending against relators' counterclaims. Rather than permit relators to prosecute their counterclaims, based on suspect accounting information, the trial court could have reasonably concluded, based on relators' conduct, that no reliable accounting information was available.

Additionally, relators' claims arising from the Stainless Steel Plate Agreement were based on relators' allegations that Jindal owed them reimbursement for their expenses and commissions from sales to third parties. Relators' accounting records would have been important to proving

relators' own expenses and commission sales, and Jindal certainly would have been entitled to conduct discovery concerning relators' accounting records to defend against these counterclaims. As noted above, however, the record supports an implied finding by the trial court that relators had perjured themselves on their record-keeping practices and had tampered with their accounting evidence. Consequently, the trial court could have reasonably found a direct relationship between the offensive conduct and the sanctions it ordered, including the striking of relators' counterclaims, and doing so did not constitute an abuse of discretion.[6] *See Response Time, Inc. v. Sterling Commerce (North America), Inc.*, 95 S.W.3d 656, 661 (Tex. App.-Dallas 2002, no pet.) (concluding that offensive conduct was directly related to sanctions imposed with respect to counterclaims). By striking relators' counterclaims, the trial court prevented relators from further abusing the discovery process.

Accordingly, I would overrule relators' second issue.

### Lesser Sanctions

In their third issue, relators argue that the trial court abused its discretion in entering death penalty sanctions against them because the sanctions were excessive and because it did not properly consider lesser sanctions. They assert that although the trial court had previously entered sanctions against them on two occasions, "[t]he Court clearly did not make any finding that the previous entry of sanctions formed any basis for death penalty sanctions."

This is simply untrue. As quoted above, the trial court, in its death penalty sanc-

tions order, specifically stated that its ruling was "based upon all the evidence presented from hearings on the very first Motion to Compel to our most recent hearing, concluded on July 3, 2006, and from the totality of the circumstances and evidence before the Court." The trial court twice imposed lesser sanctions. Although relators complied with the court's *sanctions* orders, which the trial court emphasized were the largest sanctions it had ever assessed, relators failed to comply with the court's *discovery* orders.

The record clearly demonstrates that the trial court not only considered, but also imposed lesser sanctions against relators to induce their compliance with its orders, exceeding what is required by our jurisprudence, to no effect. As emphasized by the supreme court,

> [T]he trial court need not test the effectiveness of each available lesser sanction by actually imposing the lesser sanction on the party before issuing the death penalty; rather, the trial court must analyze the available sanctions and offer a reasoned explanation as to the appropriateness of the sanction imposed.

*Cire*, 134 S.W.3d at 840. Here, the trial court exercised extraordinary patience with relators and imposed the ultimate sanctions for discovery abuse only after trying lesser sanctions and further conscientious and deliberative reflection. Accordingly, I would hold that the trial court's imposition of death penalty sanctions in this case was just and not excessive.

I would overrule relators' third issue.

---

**6.** Given the record of relators' egregious discovery abuse in this case, the trial court also served the other two of the three identified, legitimate purposes for discovery sanctions, namely deterring other litigants from similar abuse and punishing the abusers. *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex. 1992).

### Conclusion

I object to the majority's failure to explain its reasoning in reaching its significant decision in this extraordinary case. However, for the foregoing reasons, I agree that we should deny relators' petition for writ of mandamus. Accordingly, I concur only in this Court's decision denying relators' petition.